UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

OHAN KARAGOZIAN,
         Plaintiff,

     v.                                   CASE NO. 3:13-cv-1028 (VAB)

LUXOTTICA RETAIL
NORTH AMERICA,
         Defendant.

**<u>RULING ON THE DEFENDANT'S</u>**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff, Ohan Karagozian, has sued his former employer, Luxottica Retail North America ("Luxoticca"), alleging that he was terminated in retaliation for engaging in certain kinds of protected speech.  Am. Compl., ECF No. 11.  First, he claims that he was terminated for complaining about unlawful activity to his supervisors, the Connecticut Department of Public Health, and the Board of Examiners for Optometrists in violation of Connecticut's whistleblower statute, Connecticut General Statutes section 31-51m.  Compl. at Count One, ECF No. 11.  Second, he alleges that he was terminated for engaging in speech on matters of public concern protected by the First Amendment of the U.S. Constitution and sections 3 , 4, and 14 of the Connecticut Constitution, in violation of Connecticut General Statutes section 31-51q.  Compl. at Count Two, ECF No. 11.  To address these alleged violations of law, Mr. Karagozian seeks compensatory and punitive damages, reinstatement to his former position, as well as costs and attorney's fees.  *Id.* at 7.

Luxoticca has moved for summary judgment on both of his claims.  Def.'s Mot. for Summ. J., ECF No. 46.  For the reasons that follow, the motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.   STATEMENT OF FACTS[1]

Luxoticca hired Mr. Karagozian to work as a licensed optician at a Sears Optical store in Waterford, Connecticut in September 2012.  Def.'s Local Rule 56(a)1 Stmt. ¶1, ECF No. 48.  In this position, he filled prescriptions for eyeglasses, and fitted, sold, and repaired eyeglasses. *Id.* ¶4.  He was supervised by the store's manager, Kira Arroyo, who in turn was supervised by Regional Sales Manager Amy Kaufman. *Id.* ¶¶2, 6.

While employed by Luxoticca, Mr. Karagozian's complained about two aspects of its business that form the basis for this lawsuit.  First, he complained both internally and to the Connecticut Department of Public Health that the store was operating with an expired permit.  Second, he complained to his supervisors and the Board of Examiners for Optometrists that he was asked to perform duties that were illegal for a licensed optician to perform under Connecticut law.

### A.  Mr. Karagozian's Complaints About the Expired Permit

On September 24, 2012, Mr. Karagozian told Ms. Arroyo that the optical permit posted in the store had expired on September 1, 2012. *Id.* ¶¶5-6; Karagozian Dep. 44:13-45:1.  He was concerned about the permit because he understood that he could have his license revoked and be sent to jail for working in a store with an expired permit.  Def.'s Local Rule 56(a)1 Stmt. ¶9.  Under Connecticut General Statutes section 20-150(a),

---

[1] These facts are based on a review of the pleadings, Local Rule 56(a) Statements, and any responses, as well as exhibits filed by both parties accompanying the Motion for Summary Judgment and associated briefing.  Unless noted otherwise, facts described in this section are undisputed or the opposing party has not pointed to any contradictory evidence in the record.

"optical glasses or kindred products or other instruments to aid vision" may only be sold in a "registered optical establishment."  To register, a store "may apply to the Department of Public Health" for "an optical selling permit."  Conn. Gen. Stat. §20-151(a).  The permit "shall be conspicuously posted" in the store that holds it.  *Id.* A violation of this permit requirement is an unfair trade practice.  Conn. Gen. Stat. §20-150(c).

In response to Mr. Karagozian's complaint about the expired permit, Ms. Arroyo followed up with Ms. Kaufman, who contacted Luxoticca's legal department.  Def.'s Local Rule 56(a)1 Stmt. ¶¶6-7.  The legal department indicated that Luxoticca had applied to renew the permit and would reach out to determine the status of that renewal. *Id.* ¶7.

Ms. Arroyo did not convey to Mr. Karagozian the actions she took to follow up on his concerns.  He asked Ms. Arroyo about the status of the permit "a week or two" after his initial inquiry, and both sides agree that she told him, in vague terms, that Luxoticca was "working on it."  *Id.* ¶¶8, 12.  Ms. Kaufman also contacted him by phone at an unknown later date and told him that the company would take care of the issue.  *Id.* ¶10.

Mr. Karagozian continued to ask about the permit because he was not sure what precisely the company was doing to resolve the situation.  *Id.* ¶¶ 12-13; *see also* Karagozian Dep. 47:8-17, 70:2-17.  On October 11, 2012, Mr. Karagozian sent a reminder e-mail to Ms. Arroyo about the permit.  Def.'s Local Rule 56(a)1 Stmt. ¶14.  On November 19 and November 20, 2012, Mr. Karagozian followed up again on the status of the permit by e-mail with Ms. Arroyo and Ms. Kaufman.  *Id.* ¶¶15-16.

Luxoticca claims that, on November 26, 2012, Ms. Kaufman explained to Mr. Karagozian that the company had applied to renew the permit and that the legal department was in the process of determining the status of that application. *Id.* ¶17; Kaufman Decl. ¶13. Both sides also agree that Mr. Karagozian sent an e-mail to Ms. Kaufman on November 26, 2012 indicating that he was glad she "clarified everything today" and apologizing for "being overly concerned for no apparent reason." Def.'s Ex. 6, E-mail dated 11/26/2012. In the e-mail Mr. Karagozian also noted that "[t]he idea that the valid permit itself was not on display is, as you said, a matter I shouldn't be concerned about and that this is a matter that you're handling." *Id.*

Mr. Karagozian denies that anyone told him about the request for renewal. Pl.'s Local Rule 56(a)2 Stmt. ¶17, ECF No. 50-2. He testified that he sent the e-mail on November 26, 2012 because he feared he would lose his job but also that its contents were accurate. Karagozian Dep. 50:19-51:2. He indicates that the tone of his conversations with Ms. Kaufman about the permit was "agitated" and that her tone "led him to believe" that he would lose his job if he continued to complain about the permit. Pl.'s Counterstmt. ¶¶2-6, ECF No. 50-2; Karagozian Dep. 46:16-47:3. He also contends that Ms. Arroyo told him at some unknown date after his meeting with Ms. Kaufman that he would be fired if he continued to "bother" supervisors about the permit. Pl.'s Counterstmt. ¶5; Karagozian Dep. 47:5-7, 67:17-68:8. Luxoticca has denied that Ms. Arroyo made this statement but has not introduced any evidence indicating that it did not happen.

On November 26, 2012, the same day as his meeting with Ms. Kaufman, Mr. Karagozian also sent an e-mail to the Connecticut Department of Public Health

expressing concerns about the permit.  Def.'s Local Rule 56(a)1 Stmt. ¶20; Pl.'s
Counterstmt. ¶7; Karagozian Dep. 64:11-65:1.  The store received the renewed permit
and began displaying it in mid-January 2013.  Def.'s Local Rule 56(a)1 Stmt. ¶21.

## B.  Mr. Karagozian's Complaints About Inappropriate Duties

Mr. Karagozian also claims that Luxoticca required him to act as an assistant to
the licensed optometrist at its store, in violation of state law.  *Id.* ¶22-23; Pl.'s
Counterstmt. ¶10; Karagozian Dep. 78:23-79:14.  The allegedly inappropriate duties
included ringing up optometric fees, answering incoming calls to schedule appointments
with the doctor, responding to insurance inquiries, and receiving and collecting
information from patients before their optometric exams.  Karagozian Dep. 80:21-81:4;
Def.'s Ex. 9, Letter dated 3/27/2013.  Mr. Karagozian also testified that he was asked to
help a doctor put contact lenses in a patient's eyes in September 2012, which he also
believed was not an appropriate duty for a licensed optician under Connecticut law.
Karagozian Dep. 85:1-10.

Mr. Karagozian contends that requiring him to perform these tasks violated a
Consent Order prohibiting licensed opticians to act as "optometric assistants" under
Connecticut General Statutes section 20-138a(b).  Pl.'s Ex. 3, Consent Order at 2-3.
Section 20-138a prohibits the practice of optometry without a license but allows for the
delegation of "services" to "a trained optometric assistant" or "an optometric technician,"
so long as those services are performed under the licensed optometrist's supervision.
Conn. Gen. Stat. §20-138a(a).  A violation of this law is punishable as a class D felony.
Conn. Gen. Stat. §20-138a(b).

Mr. Karagozian complained in September and October 2012 about these work assignments to both Ms. Arroyo and Ms. Kaufman.  Pl.'s Counterstmt. ¶11; *see also* Pl.'s Exs. 6, 7, E-mails dated 10/11/2012 and 9/20/2012; Karagozian Dep. 84:6-13.  Mr. Karagozian also complained externally to the Board of Examiners for Optometrists about the work he performed on March 27, 2013.  Def.'s Ex. 9, Letter dated 3/27/2013.  In addition, he testified that he was concerned that performing these duties could jeopardize his license but that he performed them because he "want[ed] to get a paycheck." Karagozian Dep. 86:11-87:1.

### C.  Luxoticca's Complaints about Mr. Karagozian's Performance

Luxoticca had three complaints about Mr. Karagozian's performance.  First, while employed by Luxoticca, Mr. Karagozian removed the licenses of two other opticians that were hanging on the store's wall in late October or early November 2012.  Def.'s Local Rule 56(a)1 Stmt. ¶25.  Both sides agree that opticians are legally required to display their licenses in the store in which they work.  *Id.* ¶24.  They also both agree that the opticians whose licenses had been removed were working in the store at the time and were upset about the removal of their licenses.  *Id.* ¶26; Karagozian Dep. 55:22-56:7

Mr. Karagozian contends that he removed the licenses because he believed the associates did not work at the store and that he placed them in an envelope by the cash register.  Pl.'s Counterstmt. ¶8; Karagozian Dep. 52:1-16.  He also claims that he told Ms. Arroyo he was doing so and that she had no objection.  Pl.'s Counterstmt. ¶9.

Luxoticca claims that Mr. Karagozian told Ms. Kaufman that he had thrown the licenses away and that he had done so because he did not know whether the opticians worked at the store.  Def.'s Local Rule 56(a)1 Stmt. ¶28.  Ms. Kaufman contends that

6

Mr. Karagozian admitted throwing the permits away in a meeting she had with him at the end of December 2012, but Mr. Karagozian denies making this admission at any time. Karagozian Dep. 51:10-12, 55:8-12, 62:12-63:2; Kaufman Decl. ¶17; Pl.'s Local Rule 56(a)2 Stmt. ¶28.

Luxoticca also claims that customers complained about Mr. Karagozian on several occasions during his employment.  Def.'s Local Rule 56(a) Stmt. ¶¶29-32; *see also* Def.'s Ex. 8, Customer Complaints.  The complaints include allegations that Mr. Karagozian indicated that the offer a customer asked about was only for "welfare people" and that he charged the same customer for extras without asking whether she wanted them.  Def.'s Local Rule 56(a)1 Stmt. ¶30.  Separately, another customer complained that Mr. Karagozian did not offer him assistance promptly, asked him whether a dog chewed the temple tips of his glasses, and failed to replace the temple tips.  *Id.* ¶31.  Mr. Karagozian testified that he was not aware of these complaints but does not deny that the events underlying them occurred.  Pl.'s Local Rule 56(a)1 Stmt. ¶¶30-32; Karagozian Dep. 36:1-9.

Finally, Ms. Kaufman indicates that, "[o]n several occasions," Mr. Karagozian violated Luxoticca policy by "not completing Perfect Pair Worksheets when selling glasses to customers and not filling out daily reconciliation envelopes for the Store." Kaufman Decl. ¶24.  In one instance, Ms. Kaufman claims that Mr. Karagozian's failure to fill out the proper worksheet resulted in a customer paying $160 less than he should have.  *Id.*  Mr. Karagozian does not specifically contest that he filled out forms improperly.  He also testified that Ms. Arroyo told him once that he should "follow" the Perfect Pair Worksheet.  Karagozian Dep. 101:9-18.

**D.  Mr. Karagozian's Termination**

Luxoticca terminated Mr. Karagozian on February 1, 2013.  Def.'s Local Rule

56(a)1 Stmt. ¶33.[2]  During the termination meeting, Luxoticca contends that Ms.

Kaufman and Ms. Arroyo handed Mr. Karagozian a written Corrective Action Record,

which explained that he was being terminated for violating a company policy, by

removing and destroying the other optician licenses, for acting in an unprofessional

manner toward his supervisors, and because customers had complained about him.  *Id.*

¶34.  Both sides agree that he was given the Corrective Action Record at this meeting.

Def.'s Ex. 8, Corrective Action Record dated 2/1/2013; Karagozian Dep. 94:15-95:15.

The Corrective Action Record indicates that Mr. Karagozian was terminated for throwing

away the licenses of his colleagues, failing to use company forms properly, receiving six

customer complaints, and acting in an unprofessional manner towards his supervisors.

Def.'s Ex. 8, Corrective Action Record.

Ms. Kaufman has denied that the termination decision was related in any way to

Mr. Karagozian's complaints.  Kaufman Decl. ¶28.  Mr. Karagozian contends that Ms.

Kaufman and Ms. Arroyo merely told him that he was being terminated, without orally

providing reasons, and asked him to read the Corrective Action Plan.  Karagozian 94:18-

95:15, 96:1-5.[3]  He testified that he did not believe that he ever acted inappropriately at

---

[2] Mr. Karagozian contends that Luxoticca takes the position that he voluntarily left its employment.  Pl.'s
Counterstmt. ¶12.  In making this claim, he relies on a Notice of Potential Liability for Unemployment
Benefits that Luxoticca filed.  Pl.'s Ex. 4, Notice of Potential Liability dated 8/29/2014.  However, all of
the other evidence in the record indicates that Mr. Karagozian was terminated.  Indeed, Luxoticca explains
that the representation made in the Notice of Potential Liability was a mistake that was clarified later in the
proceeding.  Mot. to Strike 1-2, ECF No. 52; *see also* Decision of Appeals Referee at 3, ECF No. 57.
[3] Mr. Karagozian denies the paragraphs in which Defendant asserts that he was terminated.  Pl.'s Local
Rule 56(a)2 Stmt. ¶¶29, 34 (citing Karagozian Dep. 36, 99-101).  However, the passages of his deposition
testimony that he cites in support of these denials do not controvert that he was terminated.  Indeed, Mr.
Karagozian's own deposition testimony indicates that he understood that he was terminated and that he was
given a document, the Corrective Action Plan, that provided reasons for that termination.  Karagozian Dep.
94:15-95:15, 96:1-5.

work and that he did not agree with the reasons provided for his termination.  Karagozian Dep. 96:8-22, 100:8-16.  In support of his position, he refers to a report filed by Ms. Kaufman in which he claims she agreed that his behavior had been appropriate. Karagozian Dep. 96:8-22.  The Court has not received a copy of any such report.

Mr. Karagozian also testified that he did not raise any objections to his termination at the meeting, because he did not want to discuss "something that was already predetermined."  *Id.* 100:21-101:2.

## II.    <u>STANDARD</u>

To grant a motion for summary judgment, the Court must determine that there are no genuine issues of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Bouboulis v. Transp. Workers Union of Am.,* 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  A dispute regarding a material fact is "genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Williams v. Utica Coll. of Syracuse Univ.,* 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks and citation omitted).  In assessing a summary judgment motion, the Court must resolve all ambiguities, including credibility questions, and draw all inferences from the record as a whole in favor of the non-moving party.  *See Kaytor v. Elec. Boat Corp.,* 609 F.3d 537, 546 (2d Cir. 2010) (citations omitted).

Actions brought under section 31-51m are subject to the burden-shifting analysis set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  *McClain v. Pfizer, Inc.,* 692 F. Supp. 2d 229, 238 (D. Conn. 2010) (citation omitted); *see also LaFond v.*

*Gen. Physics Servs. Corp.,* 50 F.3d 165, 172 (2d Cir. 1995) (finding no error in applying "federal employment discrimination standards to a claim of retaliatory discharge under 31-51m(b)" because Connecticut courts would refer to these principles "in the absence of authority to the contrary").  Under this framework, the plaintiff has the *de minimis* burden of establishing a *prima facie* case by demonstrating that a genuine question of material fact exists with respect to all of the elements of his claim.  *Lafond,* 50 F.3d at 173 (citation omitted).

Once a plaintiff has made out the basic elements of his case, the burden shifts to the defendant to produce evidence, which, if true, "'would *permit* the conclusion that there was a [non-retaliatory] reason for the adverse action.'"  *Id.* at 174 (emphasis and alteration in original) (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1226 (2d Cir. 1994)).  If the defendant carries this burden, a case may still survive summary judgment if the plaintiff produces evidence that raises an inference that the defendant's non-retaliatory reason is pretext.  *Id.* (citation omitted); *see also Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1181 (2d Cir. 1996) (citation omitted) (under 42 U.S.C. §2000e-3(a) or Title VII).

Section 31-51q claims are subject to a similar burden-shifting paradigm.  *See Fasoli v. City of Stamford,* 64 F. Supp. 3d 285, 296 (D. Conn. 2014) (noting that although "section 31-51q is not expressly referred to in the case law as falling under the *McDonnell Douglas* rubric, [the analysis] is essentially the same.") (citing *Matusick v. Erie Cnty. Water Auth.,* 757 F.3d 31, 47 (2d Cir. 2014)).  Once a plaintiff has met his burden on the *prima facie* case, a defendant may avoid liability by showing, by a preponderance of the evidence, that it would have taken the same adverse employment

action even in the absence of protected speech.  *Id.* at 296 n.10 (citing *Matusick,* 757 F.3d at 47).

### III.    DISCUSSION

Mr. Karagozian claims that his complaints about the expired permit and the allegedly improper duties he was asked to perform to assist the optometrist qualify as protected speech under both sections 31-51m and 31-51q.  He argues that both of these issues that he complained about were violations of Connecticut law.  Pl.'s Opp. Br. 2, ECF No. 50.  He also contends that his supervisors threatened, implicitly and explicitly, that he would be fired if he continued to complain.  *Id.* at 2-3.

Luxoticca denies that its decision to terminate Mr. Karagozian was related in any way to his complaints, Kaufman Decl. ¶28, and argues that Mr. Karagozian's two claims should be dismissed for any of three reasons.  First, Mr. Karagozian did not engage in speech or conduct protected under either statute.  Def.'s Br. 4-6, 7-10, ECF No. 47.  Second, there is no evidence of a causal connection between the alleged statutorily protected activity and his termination.  *Id.* at 6-7, 10.  Finally, it had legitimate reasons for terminating Mr. Karagozian that were not a pretext for retaliation.  *Id.* at 11-14.

The Court will analyze each of Mr. Karagozian's claims in turn.

### A.  Retaliation for Reporting a Suspected Violation of Law
####     (Count One – Section 31-51m)

Connecticut General Statutes section 31-51m prohibits the discharge or discipline of an employee because he "reports, verbally or in writing, a violation or a suspected violation of any state or federal law or regulation or any municipal ordinance or regulation to a public body."  Conn. Gen. Stat. §31-51m(b).  Public body is defined as any public or federal agency or employee thereof.  Conn. Gen. Stat. §31-51m(a)(4).  An

employee wronged under this statute may bring a civil action seeking "reinstatement of his previous job, payment of back wages and reestablishment of employee benefits to which he would have otherwise been entitled." Conn. Gen. Stat. §31-51m(c). The employee may also seek costs and attorney's fees. *Id.*

To establish a *prima facie* case of retaliation under section 31-51m, Mr. Karagozian must show that a genuine issue of material fact exists on all of the following elements: (1) he engaged in protected activity as defined by section 31-51m, (2) he was subsequently terminated, and (3) there was a causal connection between his participation in the protected activity and his discharge. *Arnone v. Enfield,* 79 Conn. App. 501, 507 (2003), *cert. denied*, 266 Conn. 932 (2003) (citations omitted); *LaFond,* 50 F.3d at 173 (citations omitted); *Fasoli,* 64 F. Supp. 3d at 296 (noting that the causation standard is "'substantial motivating factor'") (quoting *Vinci v. Quagliani,* 889 F. Supp. 2d 348, 354 (D. Conn. 2012). As mentioned above, if Mr. Karagozian meets this initial burden, Luxoticca must produce evidence of a "legitimate, non-retaliatory reason" for terminating him. *LaFond,* 50 F.3d at 174 (citation omitted). To survive summary judgment, Mr. Karagozian then must show that a reasonable juror could believe that Luxoticca's non-retaliatory reason was pretext. *Id.* (citation omitted).

Mr. Karagozian has made two complaints that form the basis for his section 31-51m claim. To the extent his claim is based on his complaints about the additional duties he was asked to perform, which he believed were improper for a licensed optician under Connecticut law, it cannot survive summary judgment. Mr. Karagozian has not demonstrated that he complained to a "public body" before he was terminated and, therefore, cannot satisfy the third causation element of his *prima facie* case. To the

extent his claim is based on the complaints about the expired permit, summary judgment must be denied.

### 1. Complaints About Inappropriate Duties

In retaliation cases, for a causal relationship to exist between an alleged protected activity and an alleged adverse action, that adverse action must have occurred after or in response to the protected activity.  *See McAllister v. Queens Borough Pub. Library,* 309 F. App'x 457, 459 (2d Cir. 2009) (finding that plaintiff failed to state a claim of retaliation because "the only adverse employment action… his termination… occurred before his protected activity.") (citing *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir. 2002)).  Section 31-51m only protects employees who complain to public bodies. Conn. Gen. Stat. §31-51m(b).  Thus, to make an inference of causation possible in this case, Mr. Karagozian must demonstrate that he complained to a public body before his termination.  *See Calderon v. Dinan & Dinan PC,* Civil No. 3:05cv1341(JBA), 2006 U.S. Dist. LEXIS 39024, at * 18 (D. Conn. June 13, 2006) (granting a motion to dismiss on plaintiff's section 31-51m claim because she did not allege that "before her termination she reported her suspicions about wrongdoing… to any public agency.")

Mr. Karagozian was terminated on February 1, 2013 but did not complain to any external party until March 27, 2013.  All of his other complaints on this issue were purely internal and, therefore, are not protected by the statute.  *See* Conn. Gen. Stat. §31-51m(b). Accordingly, Mr. Karagozian has not met his *prima facie* burden, and summary judgment must be **GRANTED** on this aspect of his section 31-51m claim.

### 2. Complaints About Expired Permit

To the extent Mr. Karagozian's claim is based on his complaints about the expired permit, Mr. Karagozian has satisfied the first and second elements of his *prima facie* burden.  He complained to the Connecticut Department of Public Health, a public agency, before he was terminated.  Such a complaint, even if informal, is protected by section 31-51m, because the statute protects employees who "disclose" or "report" an employer's illegal activities, either verbally or in writing.  Conn. Gen. Stat. §31-51m (titled "Protection of employee who discloses employer's illegal activities or unethical practices" and providing in subsection (b) that "[n]o employer shall discharge, discipline or otherwise penalize any employee because (1) the employee… reports, verbally or in writing, a violation or a suspected violation of any state or federal law or regulation or any municipal ordinance or regulation to a public body"); *see also Schmidt v. Yardney Elec. Corp.,* 4 Conn. App. 69, 75 (1985) (noting that a retaliatory dismissal violated section 31-51m if it "contravened the public policy in favor of encouraging citizens 'to raise the "hue and cry" and report [crimes] to the authorities.'") (citations omitted and alteration in original)

Luxoticca argues that Mr. Karagozian cannot show that he reported a violation of law because its actions constituted no more than "a technical violation."  Def.'s Br. 5. The Court disagrees.  Connecticut law requires that stores that sell glasses register and display a valid permit.  Conn. Gen. Stat. §§20-150(a), 20-151(a).  Selling glasses in an unregistered store constitutes an unfair trade practice.  Conn. Gen. Stat. §20-150(c).  In complaining that the permit expired, Mr. Karagozian, therefore, made a good faith

complaint that Connecticut law was being violated.  *See Arnone,* 79 Conn. App. at 506 -

507 (noting that complaints under section 31-51m must be made in "good faith").

To establish a causal connection under section 31-51m, Mr. Karagozian must

show that the protected action was "a motivating factor for employer retaliation, but not

necessarily the only factor."  *Fasoli,* 64 F. Supp. 3d at 297 n.11; *see generally Gonska v.*

*Highland View Manor, Inc.,* No. CV126030032S, 2014 WL 3893100, at *7 (Conn.

Super. Ct. June 26, 2014) (noting that the Superior Court has "previously found

'compelling reasons to believe that our state appellate courts would not choose to follow

the "but for" causation standard . . . in connection with . . . state . . . retaliation statutes.'")

(citation omitted).  To satisfy his *prima facie* burden on this element, Mr. Karagozian

may rely on circumstantial evidence, such as temporal proximity, or direct evidence of

retaliatory animus.  *Fasoli,* 64 F. Supp. 3d at 297 (citation omitted).

In this case, the temporal proximity between Mr. Karagozian's complaint to the

Connecticut Department of Public Health and his termination (just over two months) as

well as the comments he claims Ms. Arroyo made explicitly expressing retaliatory intent

satisfy his burden on the third element.  *See McClain,* 692 F. Supp. 2d at 240 (noting that

the temporal proximity of a few months between plaintiff's complaint and her

termination "raises 'at least a genuine issue of material fact as to whether there was a

causal connection between plaintiff's whistle-blowing activities' and her termination.")

(quoting *Ritz v. Town of East Hartford,* 110 F. Supp. 2d 94, 100 (D. Conn. 2000)); *see*

*also LaFond,* 50 F.3d at 173 (noting that the plaintiff's *prima facie* burden on section 31-

51m claims is *de minimis*) (citation omitted).

In response, Luxoticca has provided a number of legitimate, non-retaliatory reasons for terminating Mr. Karagozian, including that customers complained about him and that he failed to complete required paperwork, causing a financial loss to Luxoticca on a sale.  These contentions, if true, are non-retaliatory and legitimate reasons for terminating someone.  Thus, to survive summary judgment, Mr. Karagozian must produce some evidence that these reasons were pretext.

"'Pretext may be demonstrated either by the presentation of additional evidence showing that "the employer's proffered explanation is unworthy of credence," or by reliance on the evidence comprising the prima facie case, without more…'" *Lafond,* 50 F.3d at 174 (quoting *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 38 (2d Cir. 1994)). He need not definitively prove that the reasons are pretextual at this stage, but instead must proffer admissible evidence that "'shows circumstances that would be sufficient to permit a rational finder of fact to infer a [retaliatory] motive.'" *Id.* at 173 (quoting *Chambers*, 43 F.3d at 38).

First, while Mr. Karagozian does not dispute that the events underlying these complaints occurred, he disagrees that they should have resulted in his termination.  Such a disagreement cannot satisfy Mr. Karagozian's burden of showing that the legitimate reasons offered by Luxoticca are pretext.  *See Young v. Pitney Bowes, Inc.,* No. 3:03CV1161(PCD), 2006 WL 726685, at *16 (D. Conn. Mar. 21, 2006) ("'[m]erely disagreeing with an employer's assessment, or even suggesting that an employer has not been fair in its stated reasons for terminating an employee does not satisfy a plaintiff's burden'" on pretext) (quoting *Jensen v. Garlock, Inc.,* 4 F. Supp. 2d 219, 223 (W.D.N.Y. 1998)).

Second, Mr. Karagozian argues that pretext exists here because he testified that he was not given any of the legitimate reasons when he was terminated.  Pl.'s Opp. Br. 3, 9.  Mr. Karagozian, however, admits that he received the Corrective Action Plan that lists the reasons he was fired.  Karagozian 94:15-95:15.  Although he does dispute that he threw away the other opticians' licenses that he removed from the wall, Pl.'s Local Rule 56(a)1 Stmt. ¶28, he does not dispute that customers complained about him or that he failed to properly complete Luxoticca forms.  He also does not dispute the authenticity of the Corrective Action Plan.

Third and finally, Mr. Karagozian argues that the reasons provided for terminating him are pretext because Luxoticca claimed that he voluntarily resigned in a document filed with the Department of Labor.  Pl.'s Opp. Br. 3, 9.  As discussed above, there is ample record evidence, including Mr. Karagozian's own testimony, which indicates he was terminated.

In any event, Mr. Karagozian has produced evidence that Ms. Arroyo made a comment explicitly expressing retaliatory intent.  She said that he would be terminated if he continued to "bother" Ms. Kaufman.  The comment was made within two months of when he was terminated.  Making all inferences in Mr. Karagozian's favor, a reasonable juror could conclude from this comment and its timing that retaliation was a "motivating factor" in terminating him.  *See LaFond,* 50 F.3d at 175 (reversing a grant of summary judgment on a section 31-51m claim because a reasonable juror could conclude from the evidence that plaintiff was terminated because he complained to a public body, despite the fact that defendant satisfied its burden and provided a legitimate, alternate reason for his termination).

Accordingly, summary judgment on this aspect of Mr. Karagozian's section 31-51m claim, based on the complaints about the expired permit, must be **DENIED.**

### B.  Retaliation for Engaging in Protected Speech (Count Two)

Under Connecticut law, an employer is liable for compensatory and punitive damages as well as attorney's fees and costs to an employee who was disciplined or discharged "on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or sections 3, 4,or 14 of article first of the [Connecticut Constitution]."  Conn. Gen. Stat. §31-51q.[4]  To recover damages, the statute also requires the employee to show that the protected speech "does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer."  Conn. Gen. Stat. §31-51q. Sections 3, 4, and 14 of the Connecticut Constitution "mirror" the First Amendment to the Federal Constitution, "in that both protect religious liberty, freedom of speech, and the right to assemble and petition, respectively."  *Almonte v. Coca-Cola Bottling Co. of New York, Inc.,* 959 F. Supp. 569, 577 (D. Conn. 1997).

For Mr. Karagozian's claim under section 31-51q to survive Luxoticca's Motion for Summary Judgment, he must demonstrate that a genuine question of fact exists on the following three elements: (1) that he engaged in constitutionally protected speech, (2) that his employer took an adverse action against him, and (3) that there was a casual relationship between the protected activity and the adverse action.  *McClain,* 692 F. Supp. 2d at 241 (citation omitted); *see also Lowe v. AmeriGas, Inc.,* 52 F. Supp. 2d 349, 359 (D. Conn. 1999) (citations omitted), *aff'd*, 208 F.3d 203 (2d Cir. 2000).  As made explicit in the statute, he must also show that (4) the exercise of his First Amendment

---

[4] This statute applies to private employers.  *Cotto v. United Techs. Corp.,* 251 Conn. 1, 16 (1999).

rights "'did not substantially or materially interfere with his bona fide job performance or with his working relationship with his employer.'" *Trusz v. UBS Realty Investors, LLC,* Civil No. 3:09cv268 (JBA), 2010 WL 1287148, at *9 (D. Conn. Mar. 30, 2010) (quoting *D'Angelo v. McGoldrick,* 239 Conn. 356, 361 (1996)); Conn. Gen. Stat. §31-51q.  As discussed above, if Mr. Karagozian satisfies his burden on these elements, for summary judgment to be granted the Defendant must provide a legitimate reason for terminating Mr. Karagozian.  *See Fasoli,* 64 F. Supp. 3d at 296 n.10 (citing *Matusick,* 757 F.3d at 47).

Mr. Karagozian easily satisfies the second element, because he was terminated. Luxoticca argues that the first and third elements are not met.  The Court disagrees and finds that Mr. Karagozian has met his *prima facie* burden at this stage.

On the first element, the Connecticut Supreme Court has made clear that section 31-51q does not protect all types of speech and that it "should not be construed so as to transform every dispute about working conditions into a constitutional question." *Cotto v. United Techs. Corp.,* 251 Conn. 1, 17 (1999).  "A clear prerequisite" to the statute's application "is that the speech at issue must be constitutionally protected." *Schumann v. Dianon Sys., Inc.,* 304 Conn. 585, 600 (2012) (citations omitted).

"'To be protected by the First Amendment, speech must address a matter of public concern, and the employee's interest in expressing himself on this matter must not be outweighed by any injury the speech could cause' to employee relationships." *Emerick v. Kuhn,* 52 Conn. App. 724, 743 (1999) (quoting *Waters v. Churchill,* 511 U.S. 661, 668 (1994)).  Statements of public concern are those "that can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Daley v. Aetna Life and Cas. Co.,* 249 Conn. 766, 779 (1999) (quoting *Connick v. Myers,* 461

U.S. 138, 146 (1983)).  A court determines whether speech addresses a matter of public concern by "evaluating 'the content, form, and context of a given statement, as revealed by the whole record.'"  *Id.* (quoting *Connick,* 461 U.S. at 147-48).

The Second Circuit[5] has indicated that an important but not dispositive aspect of this inquiry is the speaker's motive.  *Lewis v. Cowen,* 165 F.3d 154, 163-64 (2d Cir. 1999) ("[T]he court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose.") (citation omitted); *Sousa v. Roque*, 578 F.3d 164, 173 (2d Cir. 2009) ("[A] speaker's motive is not dispositive in determining whether his or her speech addresses a matter of public concern.") (citation omitted).  Speech on a "'purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern.'"  *Sousa*, 578 F.3d at 173 (quoting *Lewis,* 165 F.3d at 164); *accord Cotto,* 251 Conn. at 17 (finding that the First Amendment "applies only to expressions regarding public concerns that are motivated by an employee's desire to speak out as a citizen.").

Luxoticca argues that Mr. Karagozian's complaints are not covered by section 31-51q, because they related to "matters of personal concern related to his employment, rather than matters of public concern."  Def.'s Br. 9.  The Court disagrees.[6]  Mr.

---

[5] The Court refers to federal case law defining the scope of the First Amendment, because Connecticut courts have determined that the scope of the First Amendment and section 31-51q are the same.  *See Baldyga v. City of New Britain,* 554 F. Supp. 2d 268, 278 (D. Conn. 2008) (citation omitted); *see also Bracey v. Bd. of Educ. of City of Bridgeport,* 368 F.3d 108, 116 (2d Cir. 2004) ("Courts construing section 31-51q consistently look to federal First Amendment law to determine whether section 31-51q gives rise to a cause of action.") (collecting cases)

[6] The question of whether Mr. Karagozian's complaints are addressed to matters of public concern is a question of law, which the Court may address at this time because there is no material question of fact as to the "content, form, and context of the speech."  *See Daley,* 249 Conn. at 782-85 (explaining that the determination of whether speech is protected under the First Amendment is a question of law, whereas the content, form, and context of the speech present questions of fact).

Karagozian complained about violations of laws which regulate the safety of the sale of eyeglasses and the way optometrist offices are run.  These are matters of public concern. *See Trusz,* 2010 WL 1287148, at *9 ("When employees speak out about potentially illegal activities of their employers that affect third parties or the community at large, courts have held that public concerns are implicated.") (collecting cases); *Lopez v. Burris Logistics Co.,* 952 F. Supp. 2d 396, 407 (D. Conn. 2013) (noting that claims of workplace safety have been accepted as matters of public concern) (citation omitted).

While Mr. Karagozian testified that he complained about these issues for fear of losing his license or going to jail, his concern for his own well-being does not necessarily indicate that his complaints were not addressed to matters of public concern.  *See Sousa,* 578 F.3d at 174 ("We make clear today [ ] that it does not follow that a person *motivated* by a personal grievance cannot be speaking on a matter of public concern.") (emphasis in original); *see also c.f. Emerick,* 52 Conn. App. at 742-43 (noting that complaints about the way the defendant ran its business were not speech on matters of public concern whereas complaints about violations of law, which could result in plaintiffs being criminally prosecuted, did constitute speech on matters of public concern).

Mr. Karagozian also satisfies the third element.  To satisfy this element, Mr. Karagozian must show that his speech was "a substantial and motivating factor" in his termination.  *DiMartino v. Richens,* 263 Conn. 639, 670 (2003) (internal quotation marks omitted) (quoting *Bd. Of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (involving a public employee)); *Schumann v. Dianon Sys., Inc.,* 304 Conn. 585, 622 n. 30 (2012); *see also Cubilla v. Town of Montville,* No. KNLCV116010874S, 2014 WL 1565899, at *7 (Conn. Super. Ct. Mar. 18, 2014) ("'Courts in Connecticut have consistently held that the

causation element of a section 31-51q claim requires that plaintiff prove that his speech was at least a substantial or motivating factor in the adverse employment action.'") (involving a public employee) (citation omitted).

On the forth element, section 31-51q requires that "'the employee's right to speak is [not] outweighed by the… employer's interest in the effective operation of the workplace.'"  *Schumann*, 304 Conn. at 623 (second alteration in original) (quoting *Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 139 (2d Cir. 1999)). Connecticut Courts apply the balancing test the Supreme Court set out in *Pickering v. Board of Education,* 391 U.S. 563 (1968), to assess whether this prong has been met. *Schumann,* 304 Conn. at 623.  They look at the "'extent of the disruption caused by the employee's speech on [1] workplace discipline, [2]harmony among co-workers, [3]working relationships, [4] the employee's job performance, [5] the responsibilities of the employee within the agency [or company] and [6] whether the speech is made publicly or privately…'"  *Id.* at 623-24 (quoting *Dangler,* 193 F.3d at 139).

Luxoticca does not argue that Mr. Karagozian cannot meet this element.  It also does not contend that his complaints interfered with his work performance.  While they had some impact on his relationship with his supervisors, any such impact was not sufficient to push his speech outside of the ambit of section 31-51q.  *See cf. Schumann,* 304 Conn. at 624-26 (finding that where a plaintiff "stopped performing nearly 50 percent of his job responsibilities" and his speech was "insubordinate in nature," it was not entitled to constitutional protection); *see also cf. Connick v. Meyers,* 461 U.S. 138, 154 (1983) (speech that "touched upon matters of public concern in only a most limited sense" and that disrupted the office and destroyed working relationships was not

protected by the First Amendment and, therefore, could not form the basis for a First Amendment retaliation claim by a public employee).

Accordingly, Mr. Karagozian has met his *prima facie* burden.  Luxoticca has provided non-retaliatory, legitimate reasons for his termination noted above—namely that he was the subject of customer complaints and failed to comply with company policy.  It argues that these legitimate reasons warrant the grant of summary judgment, apparently relying on the *McDonnell Douglas* pretext framework as it did for Mr. Karagozian's section 31-51m claim.  Def.'s Br. 11-14.

Luxoticca does not specifically invoke the defense that exists in First Amendment law under *Mount Healthy.  See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 286-87 (1977) (reasoning that an employee should not be able to avoid termination by engaging in protected conduct, even if that conduct plays a "substantial part" in the employer's decision regarding the adverse employment action).  Under *Mount Healthy,* if the defendant can show that he would have taken the adverse employment action, even in the absence of plaintiff's protected conduct, summary judgment is warranted.  *See Smith v. Cty. of Suffolk,* 776 F.3d 114, 119 (2d Cir. 2015); *see also Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 115 (2d Cir. 2011) ("'The constitutional principle at stake, [i.e., freedom from retaliation for protected speech,] is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the protected conduct.'") (quoting *Mt. Healthy,* 429 U.S. at 285-86) (alteration in original).  Pretext has no place in the analysis.  *See Deep v. Coin,* 453 F. App'x 49, 55 (2d Cir. 2011).  Some Connecticut courts have applied the defense to

claims under section 31-51q against private employers.  *See e.g., Konspore v. Friends of Animals, Inc.,* No. 3:10cv613(MRK), 2012 WL 965527, at *21 (D. Conn. Mar. 20, 2012).

Under either standard, summary judgment cannot be granted.  For the reasons discussed above under section 31-51m, Mr. Karagozian has produced evidence from which a reasonable juror could infer that the so-called "legitimate" reasons Luxoticca has provided for his termination were pretext.  Luxoticca also has failed to satisfy its burden under *Mount Healthy*, as the record evidence raises an inference that Mr. Karagozian would not have been terminated if he had not engaged in protected conduct.  *See Smith,* 776 F.3d at 125 ("'[s]ummary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision.'") (quoting *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir. 1999)).  Accordingly, summary judgment must be **DENIED** on Mr. Karagozian's section 31-51q claim.

## IV.   <u>CONCLUSION</u>

For all of the foregoing reasons, the Defendant's Motion for Summary Judgment, ECF No. 46, is **GRANTED** on the portion of the section 31-51m claim based on Mr. Karagozian's complaints about performing duties as the optometrist's assistant, rather than an optician.  Summary judgment is **DENIED** with respect to Mr. Karagozian's remaining claims.

**SO ORDERED** this 23rd day of November 2015 at Bridgeport, Connecticut.

/s/ Victor A. Bolden
Victor A. Bolden
United States District Judge

24